First case call for oral argument is Keck v. Keck. Counsel, whenever you're ready, you may proceed. You may please the court. Counsel, for the audio record, my name is Curtis Blood and I represent Fred Keck. Fred is asking that the financial judgments in this dissolution matter be reversed and the cause remanded on all financial issues. The parties separated in November of 2005. The trial began quite a bit later, February of 2008. And this order, this judgment among other things, requires Fred to pay his ex-wife $98,000 a year. $98,000 a year. It's a little over $8,000 a month. The single greatest feature of this case is a company called Guaranteed Air Freight and Forwarding that we call GAF in conversation. Van Ness's expert testified that it was worth $7.4 million. Fred's expert testified that it was failing, that it was only worth its physical assets, $591,000. The trial court found GAF was worth $3.5 million. It's our position that the record clearly shows that this was wrong. At the time of the trial, that GAF was on the brink of failure. It was not making any money. It was bleeding red ink. I want to refer to the record to prove that. What was that based on? I mean, what basis did the trial court give for that? It was obviously in between two valuations. And the trial court has the option, the discretion, of course, due to the weight of the evidence. But is there anything in the record that would indicate exactly what it was based on? The trial court made many comments earlier. It was a pretty long board judgment, I should call it. And he stuck on two things in particular. One was the revenues of the company. And the revenues of the company exceeded $10 million a year. But that's gross revenue. The judge didn't seem to be able to evaluate the net. If you want to see a company with a lot of gross revenue, that would be General Motors, but they couldn't make the net, could they? Look what happened to General Motors. Their gross was enormous. It's the net that makes a company go. And the evidence was uncontradicted in this case that the net was negative since late 2005. The other thing that the judge commented on, and he commented on this twice in his written judgment, and by the way, you'll find this in the appendix to the appellate's brief, at the bottom of A6 and the top of A7, was the real estate equity that GAF had. GAF was the record owner of $5.4 million in real estate. That real estate was transferred to GAF by Fred in 2006 in order to arrange financing that saved the company at the time. But that $5.4 million was subject to a $4.6 million debt as a mortgage. And so what we had here was about an 85% mortgage. But the circuit court talks in glowing terms of the equity, the real estate equity. But I'd submit that an 85% debt isn't much real estate equity, and as I'm going to get to in a minute through the testimony of the bank president, Douglas Knavel, it's no equity at all. I hope that answers the question. Douglas Knavel, you get right into it, people's bank president, Vandalia. And he was independent. I mean, he wasn't either party's expert. He was just an occurrence witness. But he had the blind share of the loans that financed GAF. And he was not our witness. He was not Fred's witness. He was Vandalia's witness. And he testified that at the time of trial, in 2008, that GAF had been behind on the payments on that loan, on the $4.6 million loans, since mid-2007. Mid-2007. You know, if you've been behind on your loans since, on your real estate loan for your house since 2009, you're in trouble right now. GAF was in trouble. GAF had two checking accounts at that bank. One was the operating account, and the other was the payroll account, where they paid their employees. At the time that Mr. Knavel testified, those two checking accounts were overdrawn $88,000. This was a company without cash. Their checks, according to the bank president, bounced routinely. And like I say, one of those accounts was the payroll account. During this trial, GAF was bouncing paychecks. That's the bank president's testimony. And he went on, and every day, bank officials met and discussed, what are we going to do about GAF? And he was asked, what about the paycheck? And his answer was, on account of his size, we hate to do it. Not yet. There's more. And I want to talk about GAF's financial records. I realize that those records are kept by GAF, but this is uncontradictory. By trial, GAF owed $1.8 million on unpaid invoices. This is uncontradictory. $1.8 million. Over $1 million of those unpaid invoices was more than 120 days old. Over $1 million. Unpaid invoices over four months old. Over $400,000 of those unpaid invoices had gone into the over 120 days old category in the last eight months. GAF's credit was no good. GAF's checks weren't worth the paper they were printed on, as the expression goes. At the time of trial, GAF was on COD, cash on delivery. If GAF wanted something, GAF had to go get cash and pay for it. Everybody that has a house and a job is running a business. We all are. And we know that. To get to run a business, in other words, to stay in the house, you have to pay your bills. We all know what happens when you can't pay your bills. Imagine. Imagine what happens if you're behind four months on your bills. Well, the same thing happens to the company. And for his expert, Mr. Wood, a man of evident qualifications and an extremely thorough job, as the trial court noted, said that in his opinion, he doubted that GAF would survive. He doubted the company would continue. The opposing expert had no contrary opinion. Didn't even mention that. No opinion. Oh, GAF will be fine. Oh, GAF will go on. No opinion. We cite two Supreme Court cases, Zelos and Talbot, in which our Supreme Court said that it's improper, and it's double-counted, to count goodwill that consists of the efforts of the husband, both in the value of his company, and to show his earning capacity. In other words, to count it both towards his assets and towards his ability to pay maintenance and insurance. And we think it's pretty clear that under Zelos and Talbot, what the judge did here was error. He wasn't asking for witnesses. It's just something he spun when he judged. And we think that's a very clear, it's a very bright line that the judge made. But really, that's just to give the court a handle in this case. It's to show there's something objectively wrong here. But there's something deeper wrong here, and it's also objective. And that is that the judge was living in the past. There was a time when GAF did well. GAF did well before 9-11-01. GAF struggled at the end of 01. GAF struggled in 02. GAF did well in 03 and 04, and most of 05. But we all know that a lot of companies have trouble in the last couple of years, and GAF just happens to be one of those. And starting in 05, GAF started to lose money very quickly. Very quickly. And at the time of the trial, there was no evidence to contradict, no real evidence that said that GAF was making money. All the evidence pointed to GAF losing a great deal of money. And yet, the trial court evaluated the cases if that evidence didn't exist. Of course, the statute says that the property needs to be evaluated at the time of the trial. The judge seems to have overlooked it. He was living in the past. I don't know how else to put it. The man was living in the past. And, of course, the problem is that GAF is Fred, and Fred is GAF. I mean, that's Fred's money. If GAF does well, Fred has money. If GAF is in the tank, Fred does not have money. If Fred is in the tank, because GAF is in the tank, where does $98,000 a year come from? It might as well be a million dollars. Hold him to contempt of court. I'm sure he will be. Where is the money for something like this? Fred needs a job. GAF isn't going to make it. Fred needs a job. And Fred needs a job. Vanessa needs a job. Because Fred's not going to be able to help. At least not for the $298,000 a year. The judgment also talks about the sanity test. Let's apply the sanity test to the court's finding that GAF is worth $3.5 million a year. Figure a bank is going to, as our expert said, loan 75-80% of the purchase money. Would the bank loan $2.7 million on a company with negative cash flow? That's 120 days behind on its accounts payable. Is there any evidence either way on that? Did you call a banker to come in and say no bank would loan $2.7 million? We had a certified accountant forensic expert testify, Your Honor. Is that something he testified to? Actually, I've taken this right out of his testimony. He's the one who said the sanity test. Here's how you do it. Isn't it pretty common in divorce cases to get exactly this kind of situation? The person who wants to keep an asset puts in a low-ball appraisal of its value. The other side puts in a high appraisal of the value. And the judge ends up somewhere in between. Well, I agree with that. I mean, that's a pretty common occurrence. And that happens on furniture and automobiles and whatever. This happens to be an ongoing business corporation. What's the difference in here? Usually if the judge is within the range of the evidence, it's okay, isn't it? Well, the judge himself took part in the opposing opinion. But beyond that, Your Honor, to answer the question, as I said, two pieces of evidence that there's no contradiction to. Number one is the bank saying, look at this. Look at what's going on. That the loans are so far behind that the paychecks even are bouncing. And the other is the accounts receivable evidence. That's devastating. That's just devastating. It doesn't mean that the company is worth more or less. That means something else. If I may submit, Your Honor, and it's what our experts said. It's not just that the company is worth more or less. It's that the company is going down. And it's not that Fred is invested in ten companies and this is one of them. This is Fred. Fred is going down. He's not paying his bills. He's not paying his workers. The paychecks are bouncing. His loans are in. Everything's gone south. Where is the contrary evidence? I mean, that's what troubles me about the judgment. Is where is the contrary evidence? Where is the evidence that companies do a great deal? Where is the evidence that it's weak, its bills? What evidence would there be? There were general aspersions cast on the fact that this is a closely held company. It's Fred's company. But Fred's got control of the books. But that's just aspersions, Your Honor. That's the evidence. That would be my answer. Thank you, Counsel. Thank you, Your Honor. Counsel. Good morning, Your Honors. May it please the Court, Counsel. Counsel. My name is David McDevitt. I am formerly with Taylor Law Offices in Effingham. And I have the pleasure of representing Vanessa Keck at trial. I am now a solo practitioner and I'm operating as co-counsel here with Taylor Law Offices for the purposes of this appeal. Your Honors, first, I will address one of the questions asked by the Honorable Justice. Where is the contrary evidence and how does this case differ from other dissolution of marriage cases where parties take these divergent opinions suddenly on values of property? It is true that in 2002, 2003, 2004, and 2005 that GAAF was doing well. Fred took a salary, a considerable salary, which was identified by both Mr. Wood and acknowledged by Fred. But coincidentally, the parties also separated in 1995. I'm sorry, in 2005. So it is obvious to me, Your Honor, and I think to the Court, that at the same time that the parties separated, all of a sudden the business is going into the tank. And I think that is questionable in and of itself. Was there any evidence, was there evidence that Fred was running the business into the ground for the purpose of making it look bad for the courts? Yes. Is that something you argue? It absolutely was. And it became clear, and part of this argument relates to Mr. Blood's comment that the Court was living in the past. Well, the Court was reviewing and considering much of the evidence that occurred in the past, but that was relevant because it continued up until the day of trial. Point of fact, Your Honor, what the evidence showed was in 2007, the year right before trial, Fred claimed $99,000 on his, there was a W-2 showing $99,000 in income derived from GAF. However, his personal bank accounts included deposits of $562,000. He was unable to explain the source of those deposits. There are two other items that I would point out. At the same time in 2007 that GAF was purportedly going in the tank, he did make a $62,000 payment to an entity called Parris Holdings, which was a real estate lease. He owned 5,000 plus acres roughly of real estate in Fayette County and continued to lease additional property for purposes of the hunting operation. $62,000 was paid by Fred for that lease in December of 2007, right before the commencement of the trial. The other major and glaring piece of evidence was right before trial, Fred loaned $34,000 to his son so his son could purchase a home. So the record is replete with evidence of transactions outside the scope of GAF which demonstrate Fred's, what we termed, pillaging of his closely held corporation. So I think there is ample evidence to show that there was an intentional grounding of GAF, so to speak. Mr. McDermott, when did GAF lose the AB account? I believe that was in 2006, if I recall, Your Honor. And was there any contention that that was deliberate? I argued that, but frankly, Your Honor, there wasn't a great deal of evidence to support that. I think it was part of our argument that there was a strategy on Fred's part to reduce the revenue of GAF, but there was no particular evidence of that. It was an argument I made by implication. But it was in 2006, and if I recall, the Anheuser-Busch account was less than 10% of the revenue of GAF historically. It had been an account that GAF had maintained for years and years. Your Honors, I would like to address each of the arguments. Let me ask another question about this evaluation of GAF. And I want to turn the question around that I asked Mr. Blood. I mean, this is a situation where the trial court basically rejected both experts' opinions. Basically said, neither one of these opinions do me any good. And it does kind of look like you just picked a number in between without a lot of explanation. I mean, it's one thing if one side says a coffee table's worth $10, the other side says it's worth $50, the judge says it's $35. I understand. Because maybe we all think we have a little knowledge about what a coffee table's worth, but this was a very complex evaluation of a corporation. So where is the basis for the judge's determination of the value of GAF? Your Honor, unfortunately, Judge Roberts did not set that forth specifically in the portion of the evaluation. What he did say, and not to be contrary to Your Honor, but he did not reject each opinion outright. In fact, it was an interesting way of phrasing his analysis of each of the appraisals. He said the court is authorized to accept both proposals of value. I'm not sure if that's the same thing as actually accepting each proposal of value, but he's authorized to accept each proposal of value, consider the credibility and concerns to each. What that says to me is the record is replete with other factors that affect his opinion and the credibility and reliability of each of the experts' opinions. He just didn't put them in that particular paragraph. And for instance, Your Honor, I think what he relied primarily upon with respect to David Wood's report is the lack of what I call normalization. And he says that repeatedly. Just to read part of the judgment, it says both parties have the obligation to present sufficient evidence of value and the court finds both efforts flawed. Accordingly, the court is left with making its own apples-to-oranges comparison to determine a reasonable value to place on GAF. I mean, there are statements that go both ways in the judgment, but obviously the judge didn't think much of either expert's opinion. I would agree with that statement, Your Honor. And unfortunately, when I did the research on this issue, there are many cases cited in my brief that stand for the proposition that it is permissible to accept the value in between. I've just never seen one that is this divergent. But I think the record supports what he did. And that's when I go back to the normalization. Well, first I would say that the problem is that there were two separate methodologies used. The methodology utilized by David Wood, the adjusted book value method, is specific to the balance sheet, the books, the intangible assets, et cetera. The method utilized by Reedy is not as complicated, if you will. It is a simple market comparison approach. But this normalization is the key to it. The books of GAF upon which Mr. Wood relied were inaccurate, unreliable, because the failure to take into consideration all of the personal spending that historically GAF had paid for the parties. And I put those in my brief, the payment of personal mortgages and the credit card expenses. Literally millions of dollars over the years that were siphoned off from GAF were not on the books of GAF and therefore not considered by Mr. Wood. And that's important because he rejects the market approach. He says the market approach is normally a viable method of evaluating a going concern, but not in this case because there was a lack of earnings history. Well, there would have been an earnings history, but for the historical pillaging of GAF by Fred. And that's my point, that you don't need to get into the net tangible assets and the specific and more complicated book value method. If there was historical earnings, then the market approach would have been applicable. Now, at the same time, Judge Robertson looked at the comparable sales used by Reedy and had some concerns over the comparability of those. And I think that's what he's getting. McGregor supports that. But unfortunately, he did make a couple of different comments as to his feeling on each of the opinions. The two issues that I want to address that I think are very important, Your Honor, are the second and third issues raised on appeal. What is not raised on appeal specifically is the issue of spousal maintenance. Fred requests that this Court rename the case for further findings, division of property and consideration of maintenance and attorney's fees. Let me go back for just a minute. Okay. I'll ask you the same question that I asked Mr. Blood. What exactly is the basis in the record for the judge's independent valuation of this enterprise? I think he considers both the Wood opinion and the Reedy opinion, and then he modifies those opinions by considering what I call the normalization. I think that's what he did. So you're basically saying he took the two, noted the flaws in both, and said if there hadn't been pillaging, this would have been the value? In a sense, that's what I'm saying. I think he calculated the normalization figures that I repeatedly argue, that there was $14,000 a month paid on a personal mortgage for so many years, and there was a certain amount that was paid for Fred's personal credit cards, and there was a certain amount paid for Fred's girlfriends. All of those things, I think what the Court did was went back, calculated that, and added it to Wood's opinion. He didn't say that, but I think the record supports that finding. No, he didn't say that. That's why I was asking. I couldn't quite figure out how he got to this point. I agree. I certainly wish he would have put that in the opinion, but in the absence of it, that's what I believe he did. I'm not criticizing him. He doesn't have to, but I just couldn't figure it out. Your Honor, I think the issue of the valuation of GAF, I won't go so far as to say it's irrelevant, but it affects what this Court, I would urge this Court to do, and I would ask it this way. What Judge Roberts did was he placed a value on GAF. GAF is a non-marital asset, admittedly, which means under 503, it is assigned to Fred automatically. It is only one factor, then, in the division of marital property. So what the Court did was equally divided the remaining marital estate of $3.3 million, roughly. I would submit to the Court that whether GAF is worth $7.4 million, $3.5 million, or $591,000, that the equal division of the remaining marital estate is equitable. So remaining in this case for further consideration is an exercise in futility. I do have a specific question, and I'm sorry, but I'm afraid you'll run out of time before I get a chance to ask it. You won't get to this area, but on the dissipation of marital assets, I take it this was done by the method where X number of dollars were shown that he had obtained that were unaccounted for. Yes. The burden was on him to account for where it went. Correct. And we had this issue of him paying $160,000 for a house for his now ex-wife. Correct. First question is, was that $160,000 in the amount that was shown as accounted for? I'm not sure if I understand the question, but I can tell you what happened to it. As part of the 2006 real estate transaction, when Fred conveyed all of the marital real estate to Gaff, Gaff paid for that house. Okay. So that would be your explanation of why he didn't get credit for that. That's correct. Well, two reasons. So you wouldn't disagree that buying her house would be accounting for where the money is spent and not dissipation of assets? It is absolutely accounted for. There are two problems with the offset argument made by Fred. One is Fred didn't pay for it. Gaff paid for it. Whereas the dissipated assets are very specific. I have very specific evidence on the value of the alleged dissipated assets found by Judge Roberts. But there are two major reasons. One, Gaff purchased the house, and two, he already got credit for it because it is included on Vanessa's side of the ledger when calculating the appropriate, what Roberts called the equalization payment. In dividing the marital estate equally, Vanessa got the $160,000 house. So credit is already given for it because it's on her side of the ledger and included in the calculation. Okay. My point, Your Honor, is Zell's faulty is inapplicable to this case, and I'll be very short on this. Zell's faulty, the primary argument made by Fred for not accepting or for reversing the valuation of Gaff. Zell's faulty is different because Zell's faulty involved marital assets. Counting goodwill towards the valuation of an asset as well as considering goodwill, so to speak, in the division of assets and spousal maintenance is improper if it is a marital asset. I would suggest that this is distinguishable, Your Honor. Gaff is a non-marital asset. It is automatically assigned to Fred and therefore not a 503 consideration. So it is not considered when dividing marital assets. As a result, I don't think that the primary argument holds water that since it is distinguishable from Zell's faulty, it is proper just to consider the valuation of Gaff only insofar as it's one factor in the division of property. There is no impermissible double counting when considering personal goodwill of a non-marital asset. Thank you, Counsel. Thank you, Your Honor. Counsel? Thank you, Your Honor. Yes, the business started to go into tank. In 05, it had before. But the final downturn, or it looks like it's going to be the final downturn, started in 05. I forgot what I wanted to read from the judgment. Justice Stewart, I think it was you that asked, was there any indication that it was intentional that the car that the company went into tank? And here's what the judge wrote. And this is C1088, which is A7 in the appendix to my brief. The court is not convinced that Fred has intentionally sabotaged or neglected Gaff to reduce its apparent value to the court. Justice Chapman, you asked whether there was any evidence that losing an Anheuser-Busch account was deliberate. Your Honor, what happened was there was a personnel change involving Gaff that were, certainly there were people that just weren't interested in having Gaff do it anymore. Absolutely no evidence, to answer the question, that losing an Anheuser-Busch was deliberate. It was devastating. That was a very deliberate attack. Justice Stewart, you asked where is the basis for the judge's determination. And again, what the judge keeps on mentioning is real estate equities, which like I said, they're just not there. He's not looking at the debt. And the other, he's saying the annual revenues. And again, I'm going to say General Motors had great annual revenues. Mr. Reed, ex-wife expert, his opinion was that a shipping company was worth 60% per sale of its annual revenues. That's his opinion. He didn't consider expenses at all. He wrote a lot more than that, but I'm confident that if you look at his opinion, you'll find that's what it comes down to. It's worth about 60% of what it brings in a year, regardless of what it pays out. Now, I heard exactly what I thought I was going to hear while I sat there.  over the years historical pillaging of Gaff. I heard about girlfriends from the 90s. Your honors, this is past history. We're talking about an old file that this company tipped down and didn't come back. A lot of companies did. Gaff's just one of them. A lot of people lost their houses, a lot of businesses failed. Gaff is only one of them. The judge, this case was brilliantly tried. The judge was shown everything back to the dawn of Abraham on what had been spent, by Fred and by Gaff, what had been covered, and the couple's lifestyle, which was what? But in 205, that's when things changed. The judge was living in the past. He was living in pre-205. The girlfriends, my goodness. There was a child born out of wedlock that I think is old enough to vote now. I mean, what we're talking about here is exactly what wrongly convinced the judge. Not how was the company in the 90s. It was great in the 90s. Not how was it in 2003. It was great. In 2005, it was failing, and by trial, it had been continuously failing since that time. Well, and the distinction I'm hearing on Zell's Faulty is that double counting is okay on non-marital assets. Your honors, Zell's Faulty did concern marital rather than non-marital assets, but what the court also went on to say was that it's wrong, it's wrong to double count the man's goodwill, his personal goodwill, his personal ability to make money, both on his assets and on his ability to earn money, his future ability. You don't use it to value, to puff up his assets and also say, well, then he can pay more money, too. I mean, even if it's true, that's double counting, and that's the other thing that the court said. Now, admittedly, marital assets in those cases, but would the Supreme Court back off that? It's very strong language, and I don't think that they would, and I don't think that this court should. Justice Goldenhersch, in response to one of your questions, counsel said that what he thought that the trial court had done is looked at the opinions of the experts and modified them so that there was simply piles of credit card bills from clear back to the 90s, look at this, look at this, look at this, and as far as millions of dollars, our expert went into it specifically, if I may continue the thought, went into it, said it's my job to find out where this money went, and in every company that's run like this, there's money, that's not where it should be, but he said in this case, you can't even begin to approach what suddenly accumulated, let alone show profit, and without profit, there's no value of the physical asset. Thank you, counsel. Thank you, your honor. We appreciate the briefs and arguments of all counsel. We'll take the case under advisement.